A purchaser sought damages and specific performance pro tanto of his contract with the sellers, who owned only part of the property they had contracted to sell. The trial court, after considering the contractual relationship between purchaser and the seller and the potential resulting cotenancy among strangers, declined to order specific performance pro tanto. We affirm the judgment of the trial court.
 Facts and Procedural History
This case concerns the sale of a hotel building in downtown Birmingham. Sam Raine, Jr., Norman Ceravalo, and Sammy Ceravalo purchased the Thomas Jefferson Hotel, which was later renamed the Cabana Hotel. These three individuals sold the hotel twice and then repurchased it after the purchasers went bankrupt. When Sam Raine, Jr., died, most of his interest in the hotel passed to his wife, Antoinette Raine.
The hotel occupies lots 1, 2, and 3, block 96, Survey of Birmingham prepared by Elyton Land Survey Company, and an annex to the hotel occupies lots 4 and 5. The adjacent parking lot occupies lots 8, 9, and 10. Today, Antoinette Raine owns two-thirds of the hotel and one-third of the annex. Antoinette Raine's son and codefendant, Sam Raine III, owns one-half of the eastern half of lot 8[1] and one-half of the eastern 25 feet of lot 10. Sammy Ceravalo and Norman Ceravalo own the remaining one-third of the hotel and the remaining two-thirds of the annex. Judy Lynn Blotcky owns one-half of the eastern half of lot 8 and one-half of the eastern 25 feet of lot 10. The Lewis Family Trust owns the western half of lot 8, all of lot 9, and the western 75 feet of lot 10.
Jeff Notrica, doing business as 1631 Second Avenue North, L.L.C. ("Second Avenue"), decided to purchase the Cabana Hotel building. He authorized his real-estate agent, Bill Arant, to assist him in preparing an offer. Arant, knowing that Sam Raine, Jr., had owned part of the hotel before his death in 2003, telephoned Steve Salter, Sam's son-in-law, to inquire about the property. Salter referred him to Bill Beavert, who showed the property to prospective buyers and acted as an intermediary between purchasers and the Raine family.
Beavert showed Arant the property, and Beavert told Arant that "young Sam and his mother are the ones that need to sign [the contract]." Beavert notified Sam Raine III that someone was interested in *Page 73 
purchasing the property. Raine told Beavert to contact Antoinette Raine and that she and Sam III would be receptive to an offer. Notrica executed a contract to purchase the property for $750,000, agreeing to deposit $50,000 as earnest money, and Beavert delivered the offer to Antoinette Raine. The contract identified the "seller" as "Cabana Hotel Group," a nonexistent entity whose name was inserted into the contract by Arant, who intended to determine the actual owners of the Cabana Hotel at a later time. Sam III and Antoinette Raine made some changes to the contract, initialed it, and sent it back to Notrica for his signature. It is not apparent from the record how many times the contract passed between the purchaser and the sellers, but at some point the purchase price increased to $1.1 million. Also, the Raines added Exhibit B to the contract, which contains a warranty providing that "Seller is the fee owner of the Property or is authorized to execute this document for the fee owner." Antoinette Raine's initials appear on every page of the contract, and Sam Raine III signed it. The last date on the contract is June 24, 2004, when Notrica last signed the contract. The contract provided that "time is of the essence" and that "[t]he sale shall be closed and a deed delivered on or before September 15, 2004, except Seller shall have a reasonable length of time within which to perfect title or cure defects in the title of the property."
Early in the negotiations, it was apparent that delinquent state taxes in the amount of $237,000 had to be paid in order to clear the title to the property. The taxes were not paid by September 15, 2004, and that date passed without a closing. Second Avenue states that it agreed to give the Raines time to settle the tax issue with the State. Second Avenue also states that Arant and Beavert spoke frequently about resolving the tax issue, both on the telephone and at Arant's office.
On March 18, 2005, Arant wrote Beavert a letter confirming the validity of the June 2004 contract and confirming that "the Seller is working toward clearing up the title to the property." The letter indicated that Notrica was ready to begin environmental testing on the property and would do so when he knew that the title could be, and would be, cleared. The letter included a space for Beavert to sign to indicate his agreement with the letter. Although Beavert never signed the letter, Arant testified that Beavert told him, in response to the letter, that "he was very close to having that done." On March 21, 2005, after Arant heard rumors that Watts Realty Company was working on a deal involving the Cabana Hotel, Arant met with Beavert, Antoinette Raine, and Sam Raine III at Antoinette Raine's house to discuss the contract. Antoinette Raine testified that, at that meeting, she informed Arant that the other owners, Norman Ceravalo and Sammy Ceravalo, had to sign any contract by which the property would be sold.[2] In *Page 74 
April 2005, the Raines and the Ceravalos entered into a new contract to sell the Cabana Hotel to LeerCorp for $1.3 million; LeerCorp agreed to deposit $100,000 in earnest money.
In May 2005, Arant wrote Antoinette Raine to inform her that Second Avenue was ready to proceed with closing and that Beavert had indicated that the tax issue was close to being settled. In the letter, Arant proposed a closing date of July 15, 2005, on the contract with Second Avenue. Antoinette Raine contacted Beavert and her attorney, both of whom advised her not to attend the closing with Second Avenue. Also, an agent at Watts Realty told Antoinette Raine that the contract with Second Avenue was invalid because the Ceravalos did not sign it. Neither the closing with Second Avenue nor the closing with LeerCorp occurred.
Second Avenue sued Sam Raine III and Antoinette Raine for specific performance pro tanto, seeking to enforce the contract as to the property interests the Raines actually owned for a price prorated to reflect their ownership interest. Leer-Corp moved to intervene, and the trial court granted its motion. Second Avenue and LeerCorp both moved for a summary judgment; the Raines moved to join LeerCorp's motion for a summary judgment. The trial court entered a summary judgment in favor of the Raines and LeerCorp and denied Second Avenue's motion. LeerCorp moved the trial court to certify its order as a final judgment, which the trial court did.[3] Second Avenue appeals.
 Analysis
In its summary-judgment order, the trial court found that the contract between the Raines and Second Avenue was invalid for several reasons: a lack of certainty as to the parties, a lack of mutuality, and estoppel. The court also held that "even if the contract were valid, a remedy of specific performance pro tanto would not be equitable in this case." The trial court certified its order as final and appealable "as to [Second Avenue's] claim for specific performance pro tanto." Because the question of the validity of the contract is not before us, we do not express an opinion regarding the court's holdings on estoppel, mutuality, or certainty grounds.
Specific performance pro tanto "has been a recognized remedy in equity from our earliest history." Saliba v.Brackin, 260 Ala. 103, 108, 69 So.2d 267, 271 (1953). The doctrine provides:
 "`[A] vendor whose estate is less than or different from that which he agreed to sell, or who cannot give the exact subject-matter embraced in his contract, will not be allowed to set up his inability as a defense against the demand of a purchaser who is willing to take what he can get with a compensation. The vendee may, if he so elect, enforce a specific performance to the extent of the vendor's ability to comply with the terms of the agreement. . . .'"
Saliba, 260 Ala. at 108, 69 So.2d at 270 (quotingPomeroy's Specific Performance of Contracts § 438, p. 903 (3d ed.)). "The decision to grant specific performance rests largely in the discretion of the trial judge."Stringfellow Materials, Inc. v. Lee, 438 So.2d 1387,1390 (Ala. 1983). Moreover, the trial court "will be overturned, on appeal, only if shown to be palpably erroneous."Stringfellow Materials, 438 So.2d at 1390. *Page 75 
We have held that "`"[n]either party to a contract is entitled to specific performance as a matter of right,"'" but "`whether relief shall be granted depends upon an equitable consideration of the particular circumstances of each case.'"Dendy v. Anchor Constr. Co., 294 Ala. 120, 122-23,313 So.2d 164, 165 (1975) (quoting Lee v. Crane,270 Ala. 651, 653, 120 So.2d 702, 703 (1960); and Carlisle v.Carlisle, 77 Ala. 339, 341 (1884)). In the present case, the trial court, after considering the circumstances of this case, held that "the court would be causing more problems for these parties than it would solve if it ordered Sam Raine III and Antoinette A. Raine to convey their interest in the property to [Second Avenue. Second Avenue] would then be a joint owner of the property with several people who are perfect strangers to it." Second Avenue points out that this Court dealt with similar circumstances in Pearce v. Third AvenueImprovement Co., 221 Ala. 209, 128 So. 396 (1930).
In Pearce, the Court granted specific performance pro tanto when three sellers executed a contract to sell property and the contract was void as to one of the sellers, Pearce. Pearce was a married woman, and her husband had not signed the contract; thus, the tenants argued that, "as to her, the contract was void for want of the joinder of her husband."221 Ala. at 212, 128 So. at 398. The Court enforced the contract as to the remaining two sellers, even though doing so meant that the purchaser would become a cotenant with Pearce. This Court explained:
 "The main objection seems to be that such partial performance will bring about a cotenancy between Mrs. Pearce and strangers, rather than those of her own choice. It is said this should not be done because the other owners never intended such result. In no case of part performance do the parties accomplish what they intend. The entire doctrine rests upon the fact that the vendors have intended and undertaken more than they can accomplish. Equity steps in to say if you cannot live up to the full terms of the contract, you will be held to performance so far as you can."
221 Ala. at 214, 128 So. at 399-400. In Pearce, the Court reviewed a trial court's order granting specific performance pro tanto. The Court afforded the trial court deference and found that the trial court committed "no error" in ordering specific performance. In this case, however, this Court reviews for palpable error a trial court's decision not to grant specific performance. Although we did not consider a newly created cotenancy among strangers enough to reverse a trial court's order granting specific performance pro tanto inPearce, we did not hold, and have not held, that a trial court cannot consider such a circumstance in making its initial decision. Therefore, the fact that the trial court considered the potential cotenancy among the Ceravalos and Second Avenue does not constitute palpable error in this case.
Moreover, the trial court's order reflects that the trial court considered other aspects of the contractual relationship between Second Avenue and the Raines in refusing to order specific performance. Specifically, the trial court discussed the fact that the contract named the nonexistent entity "Cabana Hotel Group," rather than the Raines, as the "seller." The court mentioned that no closing had ever occurred, despite the language in the contract indicating that "time [was] of the essence." Also, the court discussed Antoinette Raine's statement to Second Avenue and to Arant that no binding sale of the property could be made until the Ceravalos agreed to sign a sales contract.
Given the circumstances of this case, we find no palpable error by the trial court in *Page 76 
declining to order specific performance pro tanto of the contract. The court properly exercised its discretion in denying the remedy of specific performance against the Raines.
 Conclusion
Because we find no palpable error by the trial court as to its ruling on specific performance pro tanto, we affirm the summary judgment.
AFFIRMED.
COBB, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
[1] Sam Raine III's ownership interest in lot 8 is unclear in the record. The trial court's summary-judgment order states that Sam Raine III owns "a one-half interest in Lot 8." However, it also states that Judy Lynn Blotcky owns a "one-half of the east half of Lot 8" and that the Lewis Family Trust owns "the west one-half of Lot 8." These property interests total more than the whole of lot 8. The Raines, however, state that Sam Raine III owns "one-half of the East one-half of Lot 8."
[2] The Raines claim that Beavert at all times represented to Arant that the Ceravalos would have to sign any contract for purchase, but they offer as proof an unsigned affidavit by Beavert. Sam Raine III also testified that he "kept telling Mr. Arant" to present the contract to the Ceravalos, but he does not remember when he told Arant that he needed to contact the Ceravalos about the purchase of the hotel.
Arant testified that he obtained a tax assessment of the property on the Internet, which showed Sammy Ceravalo's name. Arant testified that he believed Ceravalo to be related to the Raines because Beavert referred to everyone involved, including himself, as family. Arant also received a title binder from Beavert, dated approximately 1990. The title binder showed Sammy Ceravalo's name as an owner of the hotel, along with Antoinette Raine.
[3] We note that, although LeerCorp moved the trial court to certify as final its determination as to the "enforceability of the contract," the trial court certified as final its order "as to plaintiff's claim for specific performance pro tanto"; the issue of damages remained pending in the trial court.